**In re ITEL SECURITIES LITIGATION.**

**This Document Relates to All Actions.**

**No. C–79–2168 RPA.**

United States District Court,
N.D. California.

Oct. 16, 1984.

See also D.C., 89 F.R.D. 104.

Arthur N. Abbey, Law Offices of Arthur N. Abbey, New York City, for Frank Herzlin and Dorothy F. Gray.

Jeremiah F. Hallisey, O'Brien & Hallisey, San Francisco, Cal., for Ruby Peterson.

Stephen D. Oestreich, Wolf, Popper, Ross, Wolf & Jones, New York City, David B. Flinn, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, San Francisco, Cal., for Salvatore and Hilda Laurenzano.

Theodore Russell, Pettit & Martin, San Francisco, Cal., for Itel Corp.

Norman Roy Grutman, Vito C. Casoni, Grutman, Schafrann & Miller, New York City, Philip B. Bass, R. David Mishel, Titchell, Maltzman, Mark, Bass & Ohleyer, San Francisco, Cal., for Gary B. Friedman.

M. Laurence Popofsky, Steven M. Block, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for Gerald R. Alderson, John H. Chase, Robert C. Hood, Patrick B. McManus, R. Douglas Norby and Thomas S. Tan.

Daniel W. Krasner, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for Joseph Levit.

Robert Plotkin, Plotkin & Jacobs, Ltd., Chicago, Ill., James Frank Fotenos, Law Offices of Fotenos & Thomas, San Francisco, Cal., for Gerhard K. Nonnenmacher.

Melvyn I. Weiss, David J. Bershad, Milberg, Weiss, Bershad & Specthrie, New York City, for Mark Schulman.

Richard Haas, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for Peter S. Redfield.

Melvin R. Goldman, David G. Robertson, Morrison & Foerster, San Francisco, Cal., for Richard H. Lussier.

Paul F. Bennett, David B. Gold, A.P.C., San Francisco, Cal., for Tilly Gailliard.

Philip W. Moore, III, Law Offices of Philip W. Moore, Washington, D.C., for Susan Wilhelm.

W. Robert Morgan, Morgan, Zazueta, Morgan, Towery, Morgan & Spector, San Jose, Cal., for Harold C. Hanke.

Bartlett A. Jackson, Petty, Andrews, Tufts & Jackson, San Francisco, Cal., for John H. Anderson, Thomas A. Bartlett, Gilbert E. Cox, Roderick C.M. Hall, Daniel D. Jackson, C.R. Leslie, Franklin B. Lincoln, William B. McWhirter, Fred H. Merrill and James A. Vaughn.

Richard J. Lucas, Tower C. Snow, Orrick, Herrington & Sutcliffe, San Francisco, Cal., Thomas A. Burton, Thomas W. Kelly, Breed, Abbott & Morgan, New York City, for underwriter defendants.

Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, Pa., for Louis Agnes.

Guido Saveri, Saveri & Saveri, San Francisco, Cal., for Alan Mailman.

Michael N. Khourie, Broad, Schulz, Larson & Wineberg, San Francisco, Cal., for Robert C. Gloss.

Alvin H. Goldstein, Jr., Goldstein & Phillips, San Francisco, Cal., for Arnold Goldschlager.

Richard Jaeger, Feldman, Waldman & Kline, San Francisco, Cal., for Thomas F. Papsidero.

Graham B. Moody, Jr., Philip R. Rotner, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Leonard P. Novello, Peat, Marwick, Mitchell & Co., New York City, for Peat, Marwick, Mitchell & Co.

James R. Parrinello, Dobbs & Nielson, San Francisco, Cal., for John Clark.

## OPINION AND ORDER

AGUILAR, District Judge.

This case was a massive class action against the Itel Corporation. Class plaintiffs alleged that Itel had committed numerous violations of federal and state securities laws. In June 1983, the major parties agreed to a settlement of the securities litigation and on August 18, 1983, the Court approved the settlement and entered an order of dismissal.

The case is currently before the Court on class plaintiffs' request for attorneys' fees, costs, and sanctions against certain individuals. Class plaintiffs allege that these individuals abused this Court's process and acted in bad faith by attempting to disrupt the settlement of the securities litigation.

The parties to this post-judgment proceeding have engaged in extensive discovery. Further, the Court has heard and resolved a number of motions with respect to this matter. Finally, on April 19, 1984, the Court conducted a hearing on the merits of class plaintiffs' request for attorneys' fees, costs, and sanctions. The Court received documentary evidence and heard the argument of the parties. Based on the written and oral argument of the parties, and on the voluminous evidence in the record, the Court enters the following Opinion and Order.

FACTS

The facts of the underlying securities case are extremely complex and are not relevant to the instant request for attorneys' fees, costs, and sanctions. However, for purposes of this decision, a limited recitation of the facts will suffice.

The principal focus in these post-judgment proceedings is the conduct of an attorney named I. Walton Bader.[1] Mr. Bad-

1. Throughout the course of this Opinion and Order, the Court will refer to "Mr. Bader's actions." The Court recognizes that other individuals were involved. However, from its review

er, a member of the New York bar, was involved on the periphery of *Itel Securities Litigation* for approximately two years. He was more integrally involved in other litigation involving the Itel Corporation. Others involved in the alleged wrongdoing include William F. Murphy, a Florida attorney,[2] Seymour Licht, Chairman of the Ad Hoc Bondholders Committee,[3] Alysia Kruger, Mr. Licht's daughter, and Stanford Phelps, a client of Mr. Bader's.

A dispute between holders of Itel Eurobonds and the Itel Corporation forms the background for the current conflict about the actions of Mr. Bader and others. In the earlier dispute, the Eurobond holders were represented by Mr. Licht as Chairman of the Ad Hoc Bondholders Committee and by Mr. Phelps. Mr. Licht and Mr. Phelps retained Mr. Bader as attorney for the Ad Hoc Bondholders Committee.[4] After retaining Mr. Bader, however, Mr. Licht and Mr. Phelps proceeded to resolve the Eurobond dispute directly with the Itel Corporation. Mr. Bader was not involved in the final negotiations that resulted in the settlement of the Eurobond controversy.[5] The agreement that Mr. Licht and Mr.

Phelps made with Itel seriously jeopardized Mr. Bader's application for attorneys' fees. In fact, the agreement appeared to result in Mr. Bader receiving no compensation for his work on behalf of the Ad Hoc Bondholders Committee.[6] Mr. Bader advised that Mr. Licht and Mr. Phelps should not enter into the agreement, but they did not heed this advice.

Because of their fear that Mr. Bader would receive no attorneys' fees for his work on behalf of the bondholder, Mr. Bader and Mr. Licht then turned their attention to the *Itel Securities Litigation.* From the deposition testimony it is apparent that neither Mr. Bader nor Mr. Licht had any substantive interest in the *Itel Securities Litigation.* They did, however, see the securities case as a vehicle for obtaining the fees they were unable to get in the other litigation. Thus, in March 1983, Mr. Bader and Mr. Licht entered the securities litigation for the apparent purpose of obtaining fees for their work in the Eurobond dispute.

Mr. Bader was aware that class plaintiffs and the Itel Corporation had entered into

of the record, the Court has found that Mr. Bader was the prime mover in the actions that are the focus of this Opinion and Order.

2. Mr. Murphy is the only other individual from whom class plaintiffs seek to recover attorneys' fees, costs, and sanctions.

3. Class plaintiffs originally sought attorneys' fees, costs, and sanctions against Seymour Licht. However, in December 1983, class plaintiffs settled their claims against Mr. Licht. The Court mentions Mr. Licht for the purpose of reciting the allegations that form the basis of class plaintiffs' claims against Mr. Bader and Mr. Murphy. The inclusion of Mr. Licht is not meant as a judgment about Mr. Licht's behavior.

4. Mr. Bader was Mr. Licht's attorney and counsel for the Ad Hoc Bondholders Committee. However, Mr. Bader and Mr. Licht severed their relationship during the course of these post-judgment proceedings.

5. Although Mr. Licht and Mr. Phelps ultimately resolved their dispute with Itel in Mr. Bader's absence, Mr. Bader did, in fact, do considerable legal work on behalf of the Bondholders Committee. Mr. Bader filed an insolvency proceed-

ing in Curacao against an Itel subsidiary located in Curacao. Mr. Bader also filed an action in Delaware state court asserting that Itel subsidiaries should not be permitted to upstream their assets to the parent corporation because the subsidiaries were not in bankruptcy. It is generally agreed that these legal actions provided the impetus to the negotiations that eventually led to the settlement between the bondholders and Itel.

6. Mr. Bader's fee arrangement with Mr. Licht, Mr. Phelps and the Bondholders Committee was wholly contingent. The agreement that Mr. Bader entered into states that "The amount of attorneys' fees will either be determined by agreement between the parties or by an order of an appropriate court based upon the benefits obtained by said bondholders by reason of said representation."

Mr. Bader had amassed a considerable amount of attorneys' fees and faced the prospect of getting them from his clients, perhaps by way of another lawsuit, unless he could find a way to get them from the Itel Corporation or from a court. Thus, the fee arrangement meant that both Mr. Bader and Mr. Licht had a very strong interest in getting the fees through an agreement with the Itel Corporation or from a court.

serious settlement negotiations in early 1983. He was also aware that Itel's Plan of Reorganization could not become effective until the securities litigation was settled. In this respect then, Mr. Bader believed that he could exert some leverage over Itel by threatening the negotiations for settlement of the securities litigation.

Mr. Bader made this threat to the negotiations by filing a motion in the securities litigation on March 29, 1983. The motion, brought on behalf of See More Light Investments, a partnership operated by Seymour Licht, sought to have the Court redefine the plaintiff class and to appoint a class representative for the Eurobond claims. As Mr. Bader was well aware, however, the class definition issue had been resolved three years earlier and litigation notices had long since been mailed to the class.

The motion never came to a hearing before the Court. Rather, Mr. Bader and Mr. Licht reached an agreement with the Itel Corporation. In a letter agreement dated April 28, 1983, Mr. Licht agreed that:

> Neither the Eurobond Representatives nor any of them nor any agent, attorney or other representative of any thereof shall henceforth seek to appear, intervene or participate in the securities case, whether in the District Court or any other Court, in any manner ...

In return, Itel agreed that the Eurobond Representatives could seek fees in the Delaware state court action or in the reorganization case, but not in the securities litigation. After this agreement was signed, Mr. Licht ordered Mr. Bader to withdraw the motion filed on March 29, 1983.

Counsel for Itel also wrote to Mr. Bader concerning the agreement. The May 17, 1983 letter to Mr. Bader, apparently based on an earlier oral agreement, states that:

> In connection with the *Itel Securities Litigation*, you [Bader] had withdrawn on behalf of both of your clients, all motions currently pending in the District Court. You [Bader] have further agreed, on behalf of your clients, that you will take no further action of any kind in the *Itel Securities Litigation* in any Court.... You should be aware that all parties to the securities litigation are relying on the agreements you have made in proceeding with the Stipulation of Settlement in the securities litigation.

This, however, did not end Mr. Bader's activities in connection with the *Itel Securities Litigation*. In June 1983, the parties submitted the proposed settlement of the securities litigation to the Court, and the Court indicated its preliminary approval. A hearing on final approval of the settlement was set for August 18, 1983. However, before that hearing occurred, Mr. Licht and Mr. Bader made their presence felt again.

On August 4, 1983, a woman named Alysia Kruger filed an objection to the proposed settlement. Alysia Kruger is Seymour Licht's daughter, who by all accounts knows little if anything about the Itel matter. The Kruger objection was filed by Mr. Bader, apparently at Mr. Licht's direction. In his deposition and in testimony before Judge King of the Bankruptcy Court, Mr. Licht admitted that he asked Mr. Bader to file the Kruger objection because he believed that Itel had breached an agreement by objecting to Mr. Bader's fee application in the Delaware case. In essence then, Mr. Licht has conceded that Mr. Bader filed the Kruger objection for a reason unconnected to the *Itel Securities Litigation*.

In response to the Kruger objection, Itel made further fee-related concessions in order to keep the final settlement of the securities litigation on track. Itel agreed to provide Mr. Bader with a declaration from William P. Twombey that stated that the Ad Hoc Bondholders Committee had conferred a substantial benefit on the bondholders and that it was through the actions of the Committee that the Eurobond dispute was resolved. (This was important to Mr. Bader and Mr. Licht as it would provide support for Mr. Bader's request for attorneys' fees for his work on behalf of the Bondholders Committee.) Mr. Bader, in return, promised to withdraw with prejudice any and all objections made by him or

his client as to any aspect of the settlement of the securities litigation. Bader also agreed that he would not

> participate, directly or indirectly, in any proceeding relative to the *Itel Securities Litigation,* or file or cause to be filed any papers relative thereto in the United States District Court or any other court. Moreover, [Bader] will not assist counsel or others in connection with any objections to any aspect of the settlement of the *Itel Securities Litigation.*

Pursuant to this agreement, Mr. Bader withdrew the Kruger objection.

It was at this point that Mr. Murphy came into the securities litigation. To properly understand Mr. Murphy's involvement, it is necessary to backtrack and review the record with respect to Mr. Bader's relationship with Mr. Murphy.

In June 1983, Mr. Bader apparently contacted another client, John Haralambides, who operates a discount brokerage firm in Florida. Haralambides had access to clients who traded in Itel securities. Haralambides also had a relationship with William F. Murphy, a Florida attorney who did various legal and business tasks for Haralambides. Nevertheless, Mr. Bader, Mr. Haralambides and Mr. Murphy agreed that Mr. Murphy would represent *domestic* bondholders in the *Itel Securities Litigation.* Mr. Murphy testified that he had little if any experience in the securities field and was reluctant to become involved in this scheme at the outset. According to Mr. Murphy, Mr. Bader actively encouraged him to become involved in the action. Mr. Bader's conduct here appears to be in direct violation of the agreement with Itel as expressed in the May 17 letter from Itel's counsel.

In July 1983, Mr. Bader referred the President of W & F, Inc. to Mr. Murphy in connection with the President's interest in becoming involved in the Itel matter. Mr. Murphy's other clients were referred to him by Haralambides. Apparently, none of Mr. Murphy's clients were responsible for any of the costs involved in this litigation. Rather, Haralambides agreed to finance the objections to the settlement and any other actions that might become necessary. Further, according to Mr. Murphy, Mr. Bader agreed to provide him with expertise and advice in the event Mr. Murphy ever had to become truly involved in the Itel matter. This promise too was a violation of the agreement Mr. Bader had reached with Itel back in May 1983.

After Mr. Bader had withdrawn the Kruger objection, and Mr. Bader had once again promised to stay out of the securities litigation, Mr. Murphy became involved in the *Itel Securities Litigation.* According to Mr. Murphy's deposition, Mr. Bader contacted him immediately after withdrawing the Kruger objection. Mr. Bader urged Mr. Murphy to file an objection to the proposed settlement of the *Itel Securities Litigation.* Mr. Bader also told Mr. Murphy that he [Murphy] could use the Kruger objection as a model for his own objection.

On August 17, 1983, one day before the hearing on final Court approval of the settlement, Mr. Murphy filed basically the same objection that Mr. Bader had filed on behalf of Kruger. The deposition testimony strongly indicates that Mr. Murphy had little or no knowledge about the substance of the objection he filed. Further, his local counsel had spent extremely little time reviewing the relevant documents and was similarly uninformed about the substance of the objection.

On August 18, 1983, this Court conducted a final hearing on the proposed settlement. Although Mr. Murphy's objection was not timely filed, the Court considered it on the merits. The Court rejected Mr. Murphy's objection and approved the settlement as presented by counsel for the plaintiff class and counsel for the Itel Corporation. The documents the Court signed and filed on August 18, 1983 encompassed three separate agreements: the actual settlement between the corporation and the plaintiff class; the plan of allocation; and the award of fees and costs to counsel for the plaintiff class.

Mr. Murphy filed a Notice of Appeal with respect to each of the three orders entered

by the Court on August 18. Mr. Murphy testified at his deposition that he had a number of telephone conversations with Mr. Bader in which Mr. Bader advised Mr. Murphy with respect to the appeals. In so doing, Mr. Bader once again violated his promise to stay out of the securities litigation completely.

Soon after Mr. Murphy filed his appeals, Mr. Licht told counsel for the plaintiff class that Mr. Bader was responsible for the appeals. Mr. Licht also suggested that he thought the appeals could be dismissed if class counsel consented to a redefinition of the class so that current bondholders would receive a portion of the settlement proceeds.

At this point, believing that Mr. Bader and Mr. Licht were again trying to essentially extort further fee-related concessions, counsel for the plaintiff class commenced these post-judgment proceedings. On September 26, 1983, class plaintiff sought and obtained a temporary restraining order enjoining the distribution of newly issued Itel securities to Mr. Bader, Mr. Licht, See More Light Investments, and others. Very soon after the Court issued this injunction, Mr. Murphy withdrew his appeals. According to Mr. Murphy, this action was taken at Mr. Bader's direction, as passed through Mr. Haralambides.

Once Mr. Murphy dismissed the appeals, the settlement of the *Itel Securities Litigation* became absolutely final. However, it was at this point that counsel for the plaintiff class began the extensive efforts to expose the wrongdoing perpetrated by Mr. Bader and his cohorts.

JURISDICTION:

Since the inception of these post-judgment proceedings, Mr. Bader has questioned the Court's jurisdiction over class plaintiffs' request for attorneys' fees, costs, and sanctions. In his opposition to the request for attorneys' fees, costs, and sanctions, Mr. Bader once again challenges this Court's jurisdiction over the issues before the Court. The Court has rebuffed Mr. Bader's jurisdictional attacks from the beginning and does so again in this Opinion and Order.

Fifty years ago the United States Supreme Court said:

> That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled. *Root v. Woolworth*, 150 U.S. 401, 410–12 [14 S.Ct. 136, 138–39, 37 L.Ed. 1123]; *Julian v. Central Trust Co.*, 193 U.S. 93, 112–14 [24 S.Ct. 399, 407–08, 48 L.Ed. 629]; *Riverdale Mills v. Manufacturing Co.*, 198 U.S. 188, 194 [25 S.Ct. 629, 631, 49 L.Ed. 1008] *et seq.; Freeman v. Howe*, 24 How. 450, 460 [16 L.Ed. 749]. And this, irrespective of whether the court would have jurisdiction if the proceeding were an original one. The proceeding being ancillary and dependent, the jurisdiction of the court follows that of the original cause, and may be maintained without regard to the citizenship of the parties or the amount involved . . .

*Local Loan Co. v. Hunt*, 292 U.S. 234, 239, 54 S.Ct. 695, 696, 78 L.Ed. 1230 (1934).

The instant proceeding falls within the *Local Loan* rule. The post-judgment proceeding is to preserve the integrity of this Court's judgments in general, and specifically to protect the Court's final judgment in the *Itel Securities Litigation*. Accordingly, the Court finds that it has jurisdiction over the matters pending before the Court.[7]

---

7. Throughout the course of this post-judgment proceeding, Mr. Bader has maintained that he is entitled to a jury trial on the charges leveled against him by class plaintiffs. Mr. Bader argues that if he is being charged with breach of contract and/or abuse of process, then he is entitled to a jury under the Seventh Amendment of the United States Constitution.

The Court has studied the Ninth Circuit's decisions on the granting of attorneys' fees, costs, and sanctions. The Court has found no indication that there is an entitlement to a jury trial on such matters. Of course, such proceedings

## THE COURT'S AUTHORITY TO GRANT THE RELIEF REQUESTED:

In *Roadway Express v. Piper*, the Supreme Court held that a district court has the inherent power to assess attorneys' fees against counsel. 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980). The Court cautioned that the district court's inherent power should be narrowly defined and exercised with restraint and discretion. *Id.* 447 U.S. at 764–65, 100 S.Ct. at 2463. Thus, though the Court advised that the power should be used carefully and sparingly, the Court plainly recognized that district courts could exercise their inherent authority to impose an award of attorneys' fees in the proper circumstances. *Accord, U.S. v. Blodgett,* 709 F.2d 608 (9th Cir.1983).

Similarly, in *Alyeska Pipeline Co. v. Wilderness Society* the Court acknowledged the federal court's inherent power to assess attorneys' fees as part of a fine levied on the defendant for willfully disobeying a court order or for acting in bad faith, vexatiously, wantonly, or for oppressive reasons. 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) (citations omitted). Earlier, the Supreme Court held that "bad faith" is not limited to instances in which a complaint is filed in bad faith, but that conduct in the course of litigation may also constitute bad faith. *Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973).

■ Based on the *Roadway Express* and *Alyeska Pipeline* decisions, the Court concludes that it possesses the inherent power to award attorneys' fees as a means of protecting the integrity of the judicial process and that this inherent authority extends to considering class plaintiffs' request for attorneys' fees, costs, and sanctions in this case.

do entail some factual determinations. In *Roadway Express v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), the Supreme Court required that the court conduct a hearing and that the accused have the right to address the court with respect to the allegations. *Ac-*

Furthermore, the Court also possesses statutory authority to grant the relief requested by class plaintiffs. Section 1927 of Title 28 of the United States Code provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct.

Similarly, the new version of Rule 11 of the Federal Rules of Civil Procedure empowers the Court to impose appropriate sanctions against an attorney who signs and files a document that is interposed for an improper purpose.

## THE MERITS OF CLASS PLAINTIFFS' REQUEST:

Having determined that it has jurisdiction over class plaintiffs' request, and that it has the authority to grant the relief requested, the Court turns now to consideration of the merits of the request for attorneys' fees, costs, and sanctions.

■ First of all, the Court finds that Mr. Bader's conduct in the *Itel Securities Litigation* is a proper subject for the imposition of attorneys' fees, costs, and sanctions. The Court finds that Mr. Bader's conduct falls far short of the standards to which this Court holds counsel. The Court finds that Mr. Bader's conduct in this litigation constitutes bad faith as described in *Hall* and *Alyeska Pipeline*. Furthermore, the Court finds that Mr. Bader's conduct runs afoul of the requirements of Federal Rule of Civil Procedure 11. For these reasons, the Court has decided to grant the request for attorneys' fees, costs, and sanctions under 28 U.S.C. section 1927 and Rule 11 of the Federal Rules of Civil Procedure.

*cord, Barnd v. City of Tacoma,* 664 F.2d 1339 (9th Cir.1980); *U.S. v. Blodgett,* 709 F.2d 608 (9th Cir.1982). The Court has afforded Mr. Bader the opportunity for a hearing and to address the Court. Nothing more, including a jury trial, is required.

■ Pursuant to both 28 U.S.C. section 1927 and Rule 11, the extent of recovery is limited to the attorneys' fees and costs incurred because of the improper action. Section 1927 says that the attorney who commits the misconduct "may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Further, the title of the section is *"Counsel's liability for excessive costs."* Similarly, Rule 11 speaks in terms of "an appropriate sanction which may include an order to pay the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including reasonable attorneys' fees." Thus, both section 1927 and Rule 11 contemplate reimbursement for the expenses necessarily incurred because of the misconduct. They do not contemplate an award of punitive sanctions. In other words, in making an award pursuant to section 1927 and Rule 11, the Court can only award fees and sanctions for expenses incurred in responsive or defensive actions. *See also U.S. v. Blodgett,* 709 F.2d 608 (9th Cir.1983).

In the instant case, class plaintiffs and others were forced to expend considerable efforts to defend against Bader's wrongful actions. For these efforts, class plaintiffs and others may be awarded attorneys' fees and costs pursuant to section 1927 and Rule 11.

■ Class plaintiffs also engaged in very considerable offensive actions in this post-judgment proceeding. In fact, this post-judgment proceeding is largely a creature of class plaintiffs' offensive actions against Mr. Bader and others. In saying this, the Court in no way condemns class plaintiffs' actions. On the contrary, the Court is most appreciative of class plaintiffs' efforts in bringing serious misconduct to the Court's attention. However, under section 1927 and Rule 11, the Court does not have authority to grant class plaintiffs' request for attorneys' fees and costs for these offensive actions.

■ Because of the Court's determination that it can only award fees and costs for defensive actions, the Court requested that class counsel submit a revised schedule of fees and costs.[8] The settlement of the *Itel Securities Litigation* became absolutely final on October 18, 1983. The Court finds that actions that class plaintiffs took before October 18, 1983 can be reasonably interpreted to be actions in defense of the settlement. As such, the Court has the authority to award fees and costs related to these actions. Under section 1927 and Rule 11, the Court cannot and will not award attorneys' fees and costs for any actions taken after October 18, 1983.[9] The court also requested that counsel for the Itel Corporation submit a schedule of fees and costs incurred in defending against Mr. Bader's actions.[10]

Both class counsel and counsel for Itel have submitted detailed declarations in response to the Court's request. After carefully reviewing the declarations, the Court has concluded that the amount requested, even just for defensive actions, is far out of proportion to the size of the wrong perpetrated by Mr. Bader. If the Court granted

---

**8.** Class plaintiffs' original request included all the attorneys' fees incurred in connection with this post-judgment proceeding.

**9.** The Court recognizes that this is not a perfect division into "defensive" and "offensive" actions. However, the Court is not in a position to make a more exacting division, and the Court believes that using the October 18, 1983 date produces a reasonably accurate representation of the division of counsels' time.

**10.** For reasons unknown to the Court, counsel for the Itel Corporation did not seek an award of attorneys' fees and costs by way of a request

for sanctions. Nevertheless, the Court knows and finds that the Itel Corporation was forced to incur legal expenses as a result of Mr. Bader's wrongful conduct. Further, the Court finds that counsel for the Itel Corporation has done an admirable job throughout this difficult litigation, and the Court therefore believes that counsel for Itel is just as entitled to reimbursement as class plaintiffs' counsel. For this reason, the Court requested a statement of the legal costs Itel incurred, and the Court will include Itel's counsel in the award of fees and costs against Bader.

all attorneys' fees and costs incurred before October 18, 1983, the total sanction imposed on Mr. Bader would be approximately $95,000. The Court finds that this amount far exceeds the proper amount of sanctions for Mr. Bader's misconduct.

The Court finds that sanctions of $10,000 payable to class counsel and $5,000 payable to counsel for the Itel Corporation are commensurate with the extent of Mr. Bader's wrongful conduct in this litigation. The Court will not impose any sanctions against Mr. Murphy. Though Mr. Murphy's conduct was far from exemplary, the Court finds that his conduct does not warrant the imposition of sanctions.

In making this Order, the Court wishes to make two observations. First, the Court recognizes that this award is much less than class plaintiffs had requested. By making this Order, the Court does not wish to denigrate the effort made by class counsel. Counsel for the plaintiff class has alerted the Court to a very serious instance of attorney misconduct. However, the Court will not impose excessive sanctions to reimburse counsel for expenditures they chose to make. Class counsel cannot very well create this entire post-judgment proceeding and then say that Mr. Bader has to pay for it.

Second, the Court wants to be very clear in its total condemnation of Mr. Bader's conduct. As noted earlier, it is conduct such as Mr. Bader's that section 1927 and Rule 11 are designed to prohibit and punish. The Court believes that Mr. Bader acted in a vexatious manner and has proceeded in bad faith on an number of occasions in the *Itel Securities Litigation.* Specifically the Court finds that Mr. Bader repeatedly took actions in the *Itel Securities Litigation* for the sole purpose of obtaining fee-related concessions in connection with other litigation. Because of the seriousness of this finding, the Court has considered referring this case to the New York Bar Association for disciplinary action. In light of Mr. Bader's history in this type of litigation, the Court thinks that the Bar Association might well act unfavorably toward Mr. Bader. But, although the Court finds Mr. Bader's conduct most improper, the Court will not refer the matter to the Bar Association. Rather, the Court hopes that the heavy sanctions the Court imposes in this case put Mr. Bader on notice that the courts will not tolerate his misconduct any longer.

The Court anticipates that Mr. Bader will pursue an appeal of this Order.[11] To avoid unnecessary motions, and further unnecessary expense, the Court grants a stay of this Order to allow Mr. Bader to file an appeal in the Court of Appeals for the Ninth Circuit.

For the reasons stated in the body of this Opinion and Order, and for good cause appearing, the Court hereby directs I. Walton Bader to pay sanctions in the amount of $10,000 to class counsel and $5,000 to counsel for the Itel Corporation. Further, the Court stays this Order until the Court of Appeals rules on this matter.

IT IS SO ORDERED.

11. The Court notes that Mr. Bader has filed an appeal of virtually every Order this Court has issued in the course of this litigation.